The serious business of the day. The first case, Bayshore Ford v. Ford Motor Company. Thank you, Your Honor, and may it please the Court, Christopher Handman for Ford Motor Company. With the Court's permission, I'd like to reserve two minutes for rebuttal. Our principal submission this morning is straightforward. Under the agreement, Ford had the right to quote, discontinue any heavy-duty truck at any time without liability to the dealer, end quote. Ford, in this case, discontinued the HN-80, which is a heavy-duty truck. It therefore could do so without liability for breach of contract. That's the same straightforward analysis that this Court in an admittedly unpublished decision that adopted in finding no error in the District Court's projection of the same breach of contract theory under the same contract dealing with the same Ford conduct. The District Court here, however, viewed the contract differently. It agreed that Ford had the right to discontinue any heavy-duty truck without liability to the dealer, but it imposed a caveat. It said Ford could discontinue as much as it wants so long as it maintains at least one truck. But the problem with that interpretation is the contract doesn't say that. It says Ford has the right to discontinue any heavy-duty truck. So does any mean every? It does in this context. It does. And that, this Court recognized in Fleck, is the typical definition of any. It means all or every. And we know that in this case because the agreement, when it uses any heavy-duty truck, contemplates the entire universe of the process. And it's supported by various dictionary definitions. It is supported by various dictionary definitions. And it's also supported by common usage. If, for example, you are approached by a publisher who says, would you like a subscription to three magazines? You can discontinue any subscription at any time without further obligation. Well, you know you can discontinue all three of them, not one or two. But discontinuing a subscription is a little different from cessation of relationship. And I just wonder, under Michigan law, which we are supposed to apply here, you're supposed to look at the context. And I'm just not sure that anyone reading that provision would say, oh, we can basically cut and run totally whenever we want to without any liability and, you know, any ramifications. Whereas termination, which is another form of cessation, if you will, there's huge liability attached. So I'm not sure that the context, you know, tell me how the context supports your reasoning. Well, it supports it because there was no cessation of the relationship. Did they, was this a cut and run situation or was there also warranty work? Precisely, Judge Smith. This was not a full cessation. In fact, were their products still being sold? Yes. And more importantly, there was warranty service still being done and honored. And that's an important component. That's not some glancing opportunity. Is that in the record? It is. The plaintiff's own expert at page 1149 of the appendix said two-thirds of all dealer profits come from... You make money by doing it. They make lots of money by doing that. And Ford honored that. And there's no breach of contract case here for Ford failing to pay its parts. The only claim here is for Ford simply making the economic decision that they can no longer do business. And that gets to an important point about contract law in Michigan and as anywhere else. Parties use contract to allocate risk. And the question here is this risk is about a catastrophic business failure. What do the contracts say about that? What it says is that each party is essentially to bear its own losses in that situation. In fact, the dealers are even better off because the dealers could terminate at any time if they were dissatisfied with the deal that they were left with. And had they done so, they would have forced Ford to pay an array of contractual termination benefits under the contract, as several dealers did. And Ford paid every one of them. Ford was never sued for breaching, for failing to honor its termination benefits. These dealers, however, want their cake and eat it too. They gladly took the replacement franchise that Ford set up for them. So is that your response to their argument that the contract is illusory? Yes. And the illusory nature of this contract, there's nothing illusory about this. They were still getting, as their experts said, two-thirds of their profits by virtue of this agreement. And to this day, Colony's owner at trial at page 631 of the appendix said he still to this day is operating under the Ford heavy-duty truck agreement. What do you do about our Buono? But I realize it is old, but it stands. It does. Yes, it does stand. But Buono is distinguishable for the very important reason that the contract language is entirely different. And contract language, different words have to be accorded different meanings. The key provision that we have in this agreement is... Isn't it pretty close? No, it's not actually. Because the language that in Buono is that they could discontinue any lines, body styles, and models. That's not the language we have... Wouldn't that be... Couldn't you argue here that that's everything? No. And that's precisely what this Court said in Buono, was that lines was too indeterminate. That, as the Court said at page 48 of the opinion, that lines simply referred to a type of car. But it says there's not the slightest inference that it has to do with other than that, and certainly nothing to convey the impression that under it, Chrysler is granted the right of effective termination. And that's where I come back to the issue that I raised before of there's nothing that says, oh, guess what? We can stop selling any and all... We can stop selling all trucks. Well, it does, because it says you can discontinue any trucks. And this Court's typical definition, for example, in the Fleck case, is that any does mean all. That's the typical rule. And that's borne out in other paragraphs of the agreement, for example, paragraph 6H. We have that specifically, I guess it's a Fleck case, we said any means all. Is that the same under Michigan law? It is. It's certainly a principle that all courts have recognized. The Supreme Court has recognized it in statutory interpretation. And it's a common sense view that, again, context is going to matter. There are times in which any is going to mean any one. And most of the time, as this Court recognized, it's going to mean all. Mr. Henry. Well, at this point, there was just one truck that they were manufacturing? That's correct. So that truck was any truck? That truck was indeed any truck. And so under the plain language of the agreement, the right of discontinuance was all trucks or any trucks, at least in that context. But it gets to an important point. Can I ask back, when they signed the agreement, was it known that there was going to be one model of truck? Well, different dealers signed these agreements at different times, of course. We're dealing, of course, with a whole array of dealers. But yes, for example, Bayshore, which signed it in 1976, at that time, there was just one heavy-duty truck, the Louisville truck. That was then subsequently replaced by the HN-80. But Judge Ross' question does get to one of the key interpretive difficulties with the district court's view. Under the district court's interpretation, if Ford had hypothetically been building 15 different heavy-duty trucks and discontinued 14 of them, there's no question they could do so without liability to the dealer. But suddenly, they discontinued that colossal hundreds of millions of dollars in liability. Now, nothing in the contract provides support for that muscular leap from 14, no liability, to suddenly 15, and complete liability. Well, except now, if you assume that there aren't other products, but if the trucks were the products, there is the understanding that they're going to sell products and the dealers are going to buy products. So it does seem crazy that you go down to one and then zero makes a difference. But in light of that agreement that we're going to sell trucks, it does make a difference. Well, it doesn't make a difference in this sense. The language has to be honored. And it's the same type of formulation, for example, in the GM cases. The GM cases, the Truck Center case, the Volvo GM case, and even in a different context, the click case out of the District of New Jersey. In all of those situations, the contract said GM, for example, had the right to discontinue any product at any time. Once they discontinued their heavy-duty truck, those courts said there's no liability. That's the same sort of consideration here. Mr. Hanman, and I'll be actually even more interested to hear the appellee's response to this question, but this debate turns upon the existence of, in the language of, Paragraph 13, right? Yes. I'm curious, since that is the area of controversy and since that's the basis for the plaintiff appellee's contention that the contract is effectively illusory, what if Paragraph 13 weren't in this agreement? In that case, wouldn't the only course available for plaintiffs be isn't there, in effect, a benefit to the plaintiffs by virtue of the existence of 13 here? And I want to hear especially from them. Yes, and that gets to the key aspect. The district courts seem to be motivated by a sense of inequity here, by a sense of inequity here. Oh, you said ineptitude. No, no, no. And there are two responses to those inequitable considerations. The first, as Judge Smith points out, the contract already does provide for that equitable, common-sense division. If the dealers are unsatisfied, they may terminate, and then they can trigger contractual damages. Those are essentially restitutionary benefits. They are the cost of getting into the business, making sure that these people are returned basically to the status quo ante. But the other key equitable concern, and I think this is an important one as we deal with the language of a contract, is that there's an entire range of remedies out there that already exist. Those are called state franchise protection statutes. They provide much broader remedies. They may even prevent Ford from doing these types of things in certain circumstances. But these plaintiffs strategically chose not to pursue those damages. But the point of my question is that if termination is the only option available, then there isn't any warranty work either, right? That's correct.  That retains a valuable two-thirds of their profits of the warranty service, absolutely. And that's why the- And there's no exclusivity here, is there? I'm sorry? Is there an exclusivity here on the part of the dealers? Do they have to be exclusively a Ford dealer? No. Some of these dealers, and all of these dealers, by the way, did have existing other Ford franchises, medium-duty trucks, and some even also had light-duty trucks. So they're not put out of business if all they have is the products and warranty work from Ford. They can get heavy-duty trucks from somewhere else. No, and that's why they continue to thrive, actually. And that's why they didn't repudiate or terminate the contract as they could have done. Instead, they took the best of both worlds. They took the replacement franchise that Ford offered them, that Ford went out of their way to ensure Freightliner would offer them, and then turned around and sued Ford for breach of contract for lost profits on a speculative six-year theory when this contract has no expiration date. That is the fundamental problem in this case. Why should Ford be saddled with hundreds of when the parties, when they came to allocate their risk, did so in a way that said, there's a common-sense distribution here. We have the right to discontinue products as we see fit. Now, if the dealer goes out of business, Ford also is out of pocket. It no longer can sell in that market. It's going to incur costs. The allocation of risk is each party's going to bear those costs. That's the nature. So you're saying that if we were to affirm the district court here, it would mean that if the dealer goes out of business, Ford could sue the dealer for ceasing to sell products. Well, it certainly would present an interesting conundrum. Now, Ford would, of course, have no interest in doing that, and Ford has no interest in stretching the language of the contract to do that. Instead, Ford's position is the contract should basically be enforced as it's written. That any means its typical meaning of all, and that when it says, discontinue any heavy truck at any time without liability to the dealer, it means precisely what that says. Not some, not a few, not an indeterminate subset, but all of them. There's nothing offensive about that view, and to the extent there are concerns about a franchise or discontinuing in a way that's unfair, well, that's precisely why 50 states in the union enacted liberal franchise protection statutes, because contracts like these in Chrysler, for example, and the Bono sales were viewed to be inequitable. They didn't do those because they wanted class certification, and you can't get class certification with 50 different state laws. You can, however, get under common form contracts, but if you proceed under contract, you live by the law of contract, and the law of contract says parties are held to their bargain, and the bargain that the parties here struck was that Ford's entitled to discontinue as it sees fit, and if the dealers don't like that, they have a remedy. They can trigger those contractual termination benefits. I see I have six seconds left on my clock, so I'll try to beat the buzzer and reserve my time for rebuttal. Thank you. Good morning. May it please the Court, my name is James Elway. It's my privilege to represent the plaintiffs and the appellees here. This Court should affirm the careful and thoughtful summary judgment entered by Judge Linares, which is completely supported by precedent from this Court and by the Sixth Circuit under Michigan law. The judgment returned by the jury should also be affirmed as it was the product of a fair and hard-fought trial in which Defendant Ford had every opportunity to make all of its arguments to the jury in the District Court. But doesn't Ford make a good point that in terms of plain language, any means all, and that that is a definition supported by multiple common sources like dictionaries, and under Michigan law, we're required to uphold unambiguous contractual? The answer to that, Judge Smith, is Ford is wrong in that argument. Let me explain why. Any does not always equal all. One of the dictionary definitions of any in the Ali case decided by Ford is one or some, no matter which. In fact, in many dictionaries, it's the first definition. Well, and don't we have an ambiguity here? And if we have an ambiguity under Michigan law, you take parole evidence and you don't decide it on summary judgment. You try to find out, you know, whether there was a meeting of the minds as to this. Everybody's arguing about what this provision means. It seems to me perhaps it's ambiguous. It's not ambiguous in the context here, which Michigan law says we have to apply. You have to look at the entire contract. We have to give all of the parts of the contract their plain and ordinary meaning. We have to put them together and see if we can divine what the intention of the parties were. If I can go a little bit further on the any and all situation. Let me give an example, if I might. Ford gave an example. Let me give one of my own. Let's suppose you go to a diner and there's a fixed price menu. And on it, it says, you may choose any dessert from the menu as part of your meal. Clearly, you cannot choose all of the desserts on the menu as part of your meal. If we had a contract action in which the diner was saying, I had a right to all of the desserts and I only got one, they would lose on summary judgment. I think it's a great example, but I can tell you this, and so can my clerks, there is not a diner in Altoona with a fee-free item on the menu. Nowhere. Well, let me offer this. Let's say you order six items on the menu and they all come. And the menu says, you can turn back any item that you are not satisfied with. Could you not turn back every item? And the reason that any depends, the way any is used depends upon the context in which it is used. Okay. And here is where you choose to do something, you can do something to any. Turn back any dessert, you can order five desserts, you can turn back any one that you don't like. Sure. There are circumstances where any does mean all, even in this contract, where they talk about when you use it as negation, Fort Site 6H, when they say, oh look, the heavy duty truck, singular, any, doesn't make sense here because it says you can't make any false statement to any. But why doesn't the context here give termination as the remedy? You're not happy, you're out of here. If Ford's not happy, they can do that if they want to totally terminate the relationship. But if they don't want to terminate the relationship and still sell products and have you do service and warranty work, the contract says they don't have, termination is not obligated. And the district courts seem to think that that is the remedy and if you don't do that, then you're in breach. What the district court said was, and look at the essence of this contract. What is the essence of this contract? The essence of this contract is a relationship between two parties with no term, with no end date. They're going to be going forward in what they hope to be a long-term relationship. The dealers themselves are investing their entire fortunes, typically, in land, buildings, equipment, for one purpose, to sell Ford's products. Is it correct that all of these plaintiffs are still in business? All of these plaintiffs sell trucks. They no longer sell any heavy-duty trucks. They're all still in business selling trucks. And are they all still deriving business through the warranty work that was once provided, originally? A couple of questions there. Let me unpack them if I can. Not all of the plaintiffs are in the truck business. Some of them have gone out of the truck business, at least two of them that I know of. Some of them are in the truck business limping along with the light trucks and medium trucks because they had a light truck franchise and a medium truck franchise, all separate contracts. Some of them are in business where they all became sterling dealers, and sterling went out of business in 2008. Terminated all their dealers, paid them all the termination benefits when they went out of business. So on the second part, I lost the second part of your question. The warranty work. I want to focus. That's what I was about to turn to. I wanted to focus on the warranty work. My problem here is there's a huge gulf between what Ford is saying about the warranty work and what the dealers are saying about the warranty work. According to Ford, it may be as much as two-thirds of their business. According to you, paragraph 13 renders this contract essentially illusory. So that is about as far apart as you can be. Which is it? It's arborist. Surprise. Surprise. Yes. The actual fact of the matter is that warranty work is limited. You have a warranty on your car, and how long does it last for? A certain number of miles, a certain number of years. The manufacturer has statutory obligations to provide warranty work and service work for their. So if they terminate, they go out of business. It's one of the reasons why they didn't terminate the dealers, because they were the ones who wanted to have their capability to. They wanted to sell. They wanted to sell a Freightliner one? Freightliner. They wanted the $300 million they got from Freightliner. They wanted no termination obligations or payments to any of their dealers, and they wanted the right to have somebody else take care of their obligations. Let me ask you a simple question. Yes, ma'am. Judge Lenar has found there was a breach of contract. Yes, ma'am. What is the contractual provision, the specific provision in this contract that was violated? The one at the very beginning that says that the company shall sell products to the dealer. Okay. And if after ceasing the heavy-duty trucks, they still sold replacement parts, and they still had the service aspect of the company products, sales and service, they still had that aspect, then was there a breach? Because company products were still being sold. What Judge Lenar has found, and what is exactly in line with the bonus sales case and the Carl Wentz case on the Sixth Circuit, both of which address this identical issue, is that the essence of the contract was the whole reason you become a forward dealer is so you can sell forward trucks. Do you decide this on summary judgment, the essence of the contract? That to me sounds like parole evidence when you have an ambiguity. But it's right in the contract itself. The contract itself sets forth what the essence of the contract. I mean, this is like a boilerplate provision. It's a little bit general and vague, is it not? I respectfully suggest it's not. It's in paragraph B of the sales and service agreement, the very first thing it practically says after we're now entering into an agreement. This is what is going to happen. And if you look at the preamble, it sets forth what the intentions of the parties are. The intentions of the parties are that the dealers are going to sell heavy-duty trucks. It's the name of the agreement. But why didn't the dealers negotiate a, you know, you cannot stop selling us trucks? Well, because they did. We don't want to be left with just warranty work and products. They did do that. They have a contract that said that there are specific ways that you can terminate. This is a 34-page contract that has 17 pages of it, 14 pages of it, devoted to termination and its consequences. One sentence, which is in a paragraph titled change of company products, is the one that they're saying changes all of that and turns it all around and changes everything. What this Court said in bonus sales is it is beyond belief to us that you could use that kind of sentence, that kind of clause, in a contract like this and use it as a subterfuge to say you have no rights if we decide we are going to completely go out of business. But they do have rights. They can go elsewhere and get heavy-duty trucks from somewhere else. It's not an exclusive contract. The rights we're talking about are the rights under the contract. The rights under the contract are if you are going, if you, Ford, decide you want to terminate a dealer or terminate all your dealers, there are steps that you are obliged to take. They didn't take them. They didn't want to take them because they were the ones that wanted to have their cake and eat it too. Let me shift. But didn't the dealers also themselves have the right to terminate? Yes, ma'am. And they got their remedies if they did so? Yes, ma'am. And none of them did. And none of them said they wanted to. They wanted to remain dealers. This was their livelihood. This is what they did for a living. Every one of these dealers had spent their whole life being practically a Ford dealer. They had worked very hard to get to that point. All they wanted to do was sell Ford trucks. Now, if Ford says, we're going to terminate you and everybody else, they had no choice but to accept that. But Ford didn't do that. It did not terminate any of these dealers and it did not exercise that option. And what both the Bono sales case and the Carl Wentz case said on very similar language, you can't take a provision like this one in a change of products paragraph and change that into an unfettered right to exit the business without any cost or remedy for your dealers. Let's talk about Bono. That's what I want to turn to, if you might. Obviously, you rely on it. You've argued it in the brief. But hasn't Michigan contract law changed over that 50-year period since we issued Bono? No, sir. It has not on this provision. If we're referring to the Rory case cited by Ford, absolutely not. What Rory talked about was a pretty limited byway of Michigan law. The Rory majority said, I think in footnote 85 itself, we're not changing the law. This is settled Michigan law that we are applying, that the intention of the parties, as set forth in the plain language of their documents, is what controls. Isn't it a significant distinction, however, between Bono and what we have here? In Bono, which was Chrysler and the DeSoto product, we effectively said that if Chrysler stopped selling all DeSotos, then, and this I think is the exact language, that that would effectively terminate the contract. But there was no warranty component in Bono. Doesn't that make a difference? No, sir. It doesn't at all. If I could, let's compare paragraph 20 from the Chrysler contract to paragraph 13 from the Ford contract. And if you look at them, they are virtually identical. The first sentence in paragraph 20. 20 or 21? 20. 20 of DeSoto. Yeah, DeSoto. Sorry, if I can just have a second to get to it. The first sentence of paragraph 20 says, DeSoto Plymouth at any time may discontinue any models, plural, lines, plural, or body styles, plural. Judge Rendell, you pointed out earlier that these are all plural. Now, let's look at the paragraph 13 in Ford's contract. Last sentence. The company may discontinue any heavy-duty truck that's singular or other company product at any time without liability to the dealer. This gives Chrysler a better argument than Ford has here, because in that case, it was any lines, plural, which essentially means any automobile they were And in that circumstance, they had a much better argument that they had the right to exit the business. And this court said in an en banc decision, no, you can't. And the any argument that is made by Ford here is what the dissent says in bono sales. The dissent takes the position that any here means all, and therefore that Chrysler had the right to do that. That's the dissent. The majority obviously rejected that position and came to a different conclusion and then went on to say, what we have to do is look at this in the context of the entire contract. What does this paragraph mean? They said the plain meaning of this paragraph is it gives the right to the manufacturer to control its product model to be able to say, while still maintaining the binding force of the agreement, it can still change any product or When the L series, my clients sold the L series for many years. They really liked the L series. It's in the record below. Ford replaced it with the H and A. Even if my clients liked the L series, they had no ability to say, no, you have to continue making L series. That's Ford's right. But it's an entirely different statement to say we're going to exit the business completely without exercising any of the 14 pages of termination provisions in the contract and take $300 million from Freightliner and leave you without anything to go buy. To say that it's of some benefit to them, that they get the warranty service business, that's derivative of the sales business. You get warranty and service business, it comes as it's passed down from the trucks you sell. If you stop selling trucks, you stop getting warranty work, you stop getting service work, it tapers off to nothing. I see I'm out of time, so I thank you for letting me speak today. Dr. Hanman, if I could ask you a question. Corona does seem to, we stated, granted it was a long time ago, it must be recorded that paragraph 20 does not allow the discontinuance of all models, lines, and body styles. That is a statement, even though the language says any. Do we have to embank this case to reach a different result from the district court in light of Bono? No, Judge Rendell, and for two reasons. First, the quote you said, I think you left out a key clause, which is we note in passing. I think that that was really a dictum statement. There's no citation to their in passing phrase of what any doesn't mean all. And I think that's important. There's no citation, there's no dictionary definitions, and this court has subsequently in decisions confirmed what the Supreme Court and other federal circuit courts have, which is that any typically means all. And that gets to my friend's principle point. Yes, any can sometimes mean one. The magician who says pick any card says pick one card, not the whole deck. But that's why context matters. And the question here is, my friend concedes, and I think the district court did, that if Ford was producing 15 vehicles, it could discontinue more than just one. It could do 14. The question in this case is, here's a manufacturer who was faced with a business failure and wants to get out of the business, but doesn't want to terminate because it wants to still have its dealer network provide valuable service and warranty. And Judge Smith, it is two-thirds. Their own expert said so at page 1149 of the appendix. It's not just on that. But that two-thirds doesn't go on forever. Well, no, of course not. It begins to decline, right? Well, the warranty certainly will decline at some point. Are you referring not only to warranty but to general repair? Yes. That type of work. And that's what their own expert said. Which is not necessarily tied to a warranty. Precisely. After your warranty expires, you still may go to your authorized Ford dealer, whether it's your heady beauty truck or your Focus. But the important point is that this is a contract that Ford said, we would like to discontinue this product because we aren't making any money on it. We're losing our shirt. We, however, do want to honor our valuable service network. We want to pay you for your warranty service. That's why they didn't terminate. That's why they set them up with a replacement franchise. And the question in this case is, is there something in the contract that says Ford can't do that? That it's faced with this binary all or nothing. You either keep producing trucks or you terminate them. As opposed to letting them exercise their own free rights and abilities under the contract to say, we will either terminate if we choose so or we can continue to accept the bargain that has been struck. And that's the ultimate question. And here the district court simply can't ground that interpretation in the language of that contract. Thank you very much. Thank you. Case is well argued. We'll take it under advisement.